## No. 19,919.

OMAR CAMPBELL, ET AL., *v.*
CITY COUNCIL OF THE CITY OF MONTROSE, ET AL.
(374 P. [2d] 348)

Decided August 27, 1962.    Rehearing denied September 17, 1962.

Messrs. BROOKS and MILLER, for plaintiffs in error.

Mr. JOHN E. KREIDLER, for defendant in error, City Council, City of Montrose.

Mr. HARRISON LOESCH, for defendants in error, Claud E. Roberts and Pearl L. Roberts.

Mr. CHARLES A. PETRIE, for defendant in error, Mary S. Ensley.

*In Department.*

Opinion by MR. JUSTICE MOORE.

THIS cause is here on writ of error to review a judgment of the district court of Montrose County which affirmed the action of the City Council of Montrose granting a license for the sale of spirituous liquors by the drink on premises known as Mary's Cafe, on Highway 50 in that city. The applicants for the license were defendants in error Claud E. and Pearl L. Roberts, and the owner of the premises was Mary S. Ensley.

We have read and considered the full record of the hearing conducted by the City Council and the briefs submitted by counsel for the respective parties. The learned trial judge accurately summarized this record and we could not improve upon this summary which we adopt from the judgment entered in the trial court, as follows:

"The applicants entered into a contract with Mary S. Ensley, owner of Mary's Cafe, to purchase the cafe only in the event that a hotel and restaurant liquor license was granted to them.

"In the immediate vicinity of the cafe, there is the largest concentration of motels in that area totalling three in number, and having an aggregate of 45 units. One hundred people can be served in the cafe, which was constructed in June of 1956. The applicants propose to construct an additional room on the building for the lounge, and if the license is granted, they propose to serve drinks only at the tables and not at the bar, and it is their intention to run the highest type of establishment possible under the circumstances, and to keep a high-type clientele.

"After proper notice, the City Council of Montrose held a public hearing on March 2nd, 1961, on said application, at which time evidence was introduced in support of and against the issuance of the license. On

the following day, namely, March 3rd, the Council heard arguments of the attorneys representing both sides, and immediately following the arguments, orally announced its decision approving the application. Thereafter, and on March 9th, 1961, said Council adopted a formal resolution granting said application by a vote of three to two. A copy of the resolution is attached to the complaint.

"In its decision, the City Council found that the 'neighborhood' to be considered in the matter was 'the entire City of Montrose and its surrounding suburban area.' The applicants presented petitions signed by nearly 300 persons who are residents of the city and its surrounding area favoring the license. Nearly 100 of the petitioners were owners and managers of businesses operated either in or immediately adjacent to the City. At the hearing, eight people, including the two applicants, testified in support of the application. One of these was an attorney who practiced law in Montrose, but who resided two miles west of the city, and another witness formerly resided in the immediate vicinity of the premises to be served, but now resides south of Montrose. The others who testified reside in the city of [or] the surrounding area. These witnesses testified as to the reasonable requirements of the neighborhood and contended that there was a real need for a good restaurant, such as Mary's Cafe wherein the cocktail lounge was to be located, and a service of the kind proposed, not only for the benefit of the local citizenry, but for the benefit of the tourists generally. That there was sufficient evidence to prove a prima facie case of such reasonable requirements was admitted by the protestants on page 10 of their brief.

"Pearl Roberts, one of the applicants, testified that from her investigation it was disclosed that 'at least 90 percent of your travelling people and most of your local people that eat out' demanded this service. Munro Witt, former owner of the Black Canyon Motel located east

on the adjoining property testified that 'a big percentage of people (travelling public) will ask for a nice place for a cocktail before lunch.' Another witness testified that the city needed a high caliber type of restaurant and cocktail lounge of the type proposed, that business and technical people like to have a drink before eating their meals.

"The owner of the premises stated that they served from 450 to 600 people per day during the months of July and August in the cafe since it was constructed in June of 1956, and that even at the time of the hearing they were serving from 250 to 350 per day; that there was a real need and demand for a license of this type; and that many people patronizing her place requested liquor with their meals. Another witness who was formerly associated with the Montrose Chamber of Commerce testified that there was a 'reason and need' for granting a license of this type. Another witness who operated a filling station in Montrose stated that he had between 20 to 30 inquiries a day for a place where they could obtain cocktails and a good dinner, and that there was a need for this type of business in Montrose. Another witness who lives across the street from the cafe testified that although he had signed a petition against the application, 'but if it's run like it should be run, it is a good place to eat and drink. I am in favor of it.'

"The protestants submitted petitions signed by 984 people opposed to the granting of the license, 187 of whom lives within a six-block radious of the premises to be licensed, and 21 lived within a three-block radius. At the hearing, 11 persons testified in opposition to the license, 9 of whom were residents of the three-block radius area of the premises sought to be licensed, and two were ministers and members of the Ministerial Alliance who took an active part in circulating some of the petitions in opposition to the granting of the license.

"The primary reasons given by the protestants' wit-

ness in opposition to the granting of the license were as follows:

"One witness, who lives within one-fourth of a mile of the cafe, stated that a bar in a residential area does not make for good living, and that 'where there is liquor, there will be drunkenness,' and that it would create a traffic and parking problem.

"Another, who resides across the road from the cafe, stated that it would create a traffic and parking problem. Frank Tessitore, who resides about 100 yards below the cafe, . . . stated that this type of business should be 'in the center of town, and not out . . . there in the residential district.' However, he admitted that he did not know that the area where the cafe was located was zoned for a business such as the type proposed.

"Albert Tessitore, one of the plaintiffs, and who lives a short distance south and west of the cafe, stated that a bar was not proper in a neighborhood where children play; that it would unite an undesirable element; that it would create a driving and traffic hazard; that it would be dangerous for children getting off the school bus, and that bars should be kept downtown.

"Another witness, who lives behind the cafe parking lot, opposed the application, contending that the cafe should remain a family cafe; that a bar is not in the best interests of the children; that it will be a place where construction workers will stop; that a bar would lower the real estate values in the area, and create additional traffic hazards. She admitted, however, that it would increase business in the trailer park, which she operated.

"Still another witness, who lives across the street and one hundred yards west of the cafe, testified a bar would be a disturbing influence on children; it would increase the traffic hazard and decrease the values of property; it would require additional police protection; it would result in additional jail facilities, and would lower the morals of the people; they would lose a good family-style hotel, and that reasonable requirements of the neighbor-

hood are already taken care of. He further testified that he obtained expressions from 29 people in the immediate area, and found that 21 persons were against the application, five were in favor of it, and three were neutral.

"A local minister testified that he assisted in circulating the petitions opposing the application, but contended that he did not use any force or pressure in obtaining the signatures. He also stated that he did not have the consent of the official church board to circulate the petitions from door to door, but no such consent was required.

"Another pastor stated that he, too, participated in the circulation of the petitions opposing the application. He further stated that he had no official authority from the church to take the position opposing such application."

In applying the law to the facts as above summarized, the trial court concluded:

█ "There was ample evidence in this case of the reasonable requirements of the neighborhood for the type of service sought by the applicants in this case. In fact, the plaintiffs admit the sufficiency of this evidence on pages 10, 11 and 12 of their briefs. It is also conceded that evidence of the reasonable need of the traveling public and transients is valid to show such need and demand.

█ "The plaintiffs contend that the City Council abused its discretion in that the desires of the inhabitants of the neighborhood for this type of service had [not] been proved. With this contention, this Court is in disagreement. The plaintiffs want to confine the 'neighborhood' affected as that area within a radius of three blocks or not to exceed six blocks from the cafe. The area constituting a 'neighborhood' must be determined upon the facts and circumstances of each case. These applicants strongly contend that the entire community, the surrounding suburban area, will be necessarily affected by the granting of this application, and conse-

quently, the same should constitute the neighborhood. The City Council found that 'the neighborhood which will be served by the premises proposed to be licensed is the entire City of Montrose and its surrounding suburban area.' The members of the City Council, knowing the area which they represent and the problems confronting it, are better able to consider what should constitute the 'neighborhood' after considering all of the evidence presented to it than is this Court, and the Court finds that the said Council did not abuse its discretion in making that decision."

We are in agreement with the language above quoted. The conclusions of the trial court were correct under the holdings of this Court in a number of recent decisions. We mention the following: *Geer v. Stathopulos,* 135 Colo. 146, 309 P. (2d) 606; *Cloverleaf Kennel Club v. Commissioners of Larimer County,* 136 Colo. 441, 319 P. (2d) 487; *MacArthur v. Presto,* 122 Colo. 202, 221 P. (2d) 934; *Duran v. Riggs, et al.,* 147 Colo. 278, 363 P. (2d) 656; *Quedens, et al., v. Dillon, et al.,* 146 Colo. 161, 360 P. (2d) 984; *Geer v. Presto,* 135 Colo. 536, 313 P. (2d) 980.

We find no abuse of discretion on the part of the licensing authority; the judgment is, therefore, affirmed.

Mr. Justice Frantz and Mr. Justice Pringle concur.